# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ELIZABETH A. HIBBLE, Personally, on behalf of CRH a minor, and as the Administratrix of the ESTATE OF MICHAEL W. BROOK; and ELIJAH L. ROTHELL;**<br><br>**Plaintiffs;**<br><br>**v.**<br><br>**CITY OF HARRISBURG, PENNSYLVANIA;**<br><br>**Defendant.** | **No. 1:25-cv-00636**<br><br>**District Judge: Jennifer P. Wilson**<br>**Magistrate Judge:**<br><br>**CIVIL ACTION-LAW**<br><br>**JURY TRIAL DEMANDED** |

---

## FIRST AMENDED COMPLAINT

---

**AND NOW** come the Plaintiffs, ELIZABETH A. HIBBLE, Personally, and as the Administratrix of the ESTATE OF MICHAEL W. BROOK; and ELIJAH L. ROTHELL; by and through their counsel, DEVON M. JACOB, ESQUIRE, of the law firm of JACOB LITIGATION, INC., to aver the following:

### I.    JURISDICTION AND VENUE

1.    This action is brought pursuant to 42 U.S.C. § 1983.

2.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

3.    Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because the Defendant is located within the Middle District of Pennsylvania, and the cause of action arose in the Middle District of Pennsylvania.

## II.    IDENTIFICATION OF PARTIES AND DECEDENT.

4.    Decedent, MICHAEL W. BROOK, was an adult male, who during all relevant times was a resident of Waynesboro, Franklin County, Pennsylvania. On April 13, 2023, BROOK died at the age of 64.



Michael Wayne Brook
December 29, 1958 – April 13, 2023

5.    Plaintiff, ELIZABETH A. HIBBLE ("HIBBLE"), is an adult female, who during all relevant times was a resident of Waynesboro, Franklin County, Pennsylvania. HIBBLE was BROOK'S wife. HIBBLE is CRH's grandmother and with BROOK, stood in *loco parentis* to CRH. On December 13, 2024, the Register of Wills for Franklin County, Pennsylvania, granted Letters of Administration to HIBBLE for the ESTATE OF MICHAEL W. BROOK.

6.    Plaintiff, ELIJAH L. ROTHELL ("ROTHELL"), is an adult male, who during all relevant times was a resident of Green Castle, Franklin County, Pennsylvania.

7.    Defendant, CITY OF HARRISBURG, PENNSYLVANIA ("CITY"), owns and operates the Dock Street Dam, located in the Susquehanna River, within the CITY. CITY incorporated as a city in 1860. CITY is the capital of the Commonwealth of Pennsylvania and the county seat for Dauphin County. CITY is governed by a mayor/city council form of government and operates with an annual budget of around $150 million. CITY was allocated $48 million via the American Rescue Plan Act (ARPA). CITY'S principal place of business is MLK Jr. City Government Center, 10 N. 2nd Street, Harrisburg, Dauphin County, Pennsylvania 17101.

### III.   MATERIAL FACTS

#### A.   City Developed Its Waterfront to Increase Population and Tourism

8.      The CITY borders a section of the Susquehanna River.

9.      In local legend, the 444-mile Susquehanna River was named for an Indian phrase that means "mile wide, foot deep."

10.     The river is broad and shallow and is the longest non-commercially navigable river in the country.

11.     In 1912, the CITY acted to entice people to visit the CITY and use its waterfront by acquiring almost all the property in the CITY bordering the Susquehanna River and developing it into a five-mile park – Riverfront Park – that included a lower esplanade and steps leading to the edge of the river, for walking, exercising, cycling, jogging, and fishing.

12.     In the 1980s, the Mayor of the CITY promised to act to create economic growth by revitalizing and further developing the downtown and waterfront.

13.     The CITY acted to entice people to visit the CITY and use its waterfront by building Riverside Stadium, bringing minor league baseball back to City Island, constructing the Harrisburg Marina, demolishing and removing an abandoned waste treatment plant, and constructing Skyline Sports Complex (soccer, softball, football, lacrosse and sand volleyball courts).

14.     The CITY acted to entice people to visit the CITY and use its waterfront by providing easy access for people to travel by foot or motor vehicle between City Island, and Riverfront Park and the downtown area, via the Market Street Bridge and the Walnut Street Bridge (pedestrians only).

15.     The CITY acted to entice people to visit the CITY and use its waterfront by developing and/or constructing: a Visitor's Center, the Pride of the Susquehanna Riverboat,

Riverside Village Park (food and beverage), overlook area and Riverview deck, a narrow gauge steam train and railroad station, a carousel, water taxis, Harbortown (playground), a Nature Trail (wetlands and wildlife), Water Golf (miniature golf), the Carriage House (horse drawn carriage rides), an Arcade, batting cages, public boat launches, Riverside Marina (a second marina), the Bathhouse and Beach, Riverview Pavilion, a jogging track, a Kite Shop, a replica of the John Harris Trading Post, and a parking garage and several parking lots.

16.    The CITY acted to entice people to visit the CITY and use its waterfront by hosting river festivals and special events ranging from arts and crafts to bass tournaments.

17.    In the last 100 years, the CITY has invested tens of millions of public funds to revitalize and develop the CITY'S waterfront.

18.    As a direct result of the CITY'S numerous actions, over a million people visit and use the CITY'S waterfront annually.

**B.    The Dock Street Dam**

19.    In 1913, the CITY OF HARRISBURG, PENNSYLVANIA ("CITY") constructed the Dock Street Dam ("Dam") in the Susquehanna River in the CITY.



4

20.     The Dam crosses the Susquehanna River between the Shipoke neighborhood of CITY on the east shore at Riverview Park and the Borough of Lemoyne on the west shore.

21.     The Dam is a run-of-the-river low-head dam.

22.     The Dam is a hollow reinforced concrete slab-and-buttress structure approximately 6 feet high and 3,460 feet long.

23.     The CITY constructed the Dam to eliminate stagnant mosquito-breeding pools along the river during low flow periods, control odors by submerging sewer pipe outlets along the riverbanks, and to create a lake for water recreation.

24.     The lake is a 3-mile lake upstream, with 1,500 acres of surface area, which CITY intended to be used in part for recreation.

25.     The Dam, however, is located in an exclusion zone on the river.

26.     The section of the river where the Dam is located is not open for recreational use.

**C. <u>Run-of-The-River Low-Head Dams</u>**

27.     Low-head run-of-the-river dams have continuous overflow.



28.    The overflow creates a hydraulic condition known as a "submerged hydraulic jump" or "roller" that exhibits a strong recirculating current.

29.    The hydraulic created is a dangerous condition that is not a naturally occurring feature of a river or of the type ordinarily associated with open bodies of water.

30.    As water plunges over a low-head dam, it "entrains" air – air in solution in water.

31.    Entrained air reduces the density of water, and thus, the buoyancy of floating objects like boats and people.

32.    The strong recirculating current pushes victims underwater to the bottom and downstream where the water is less aerated.

33.    The water at the bottom makes the victim more buoyant causing the victim to resurface, where the currents return the victim to the face of the dam and the cycle is repeated.

34.    The flow velocity and force of the water currents at the downstream side of a low-head dam are too strong for even experienced swimmers to escape.

35.    It is for this reason that low-head-dams are referred to as "drowning machines."

36.    When headed downriver from above the Dam, the Dam is not visible.



### D. Harrisburg-Susquehanna River Working Group 2001 Report

37. The Harrisburg-Susquehanna River Working Group ("River Working Group") was created pursuant to a Stipulation filed in litigation then pending in the Commonwealth Court of Pennsylvania between the City of Harrisburg, Department of Environmental Protection and the Pennsylvania Fish and Boat Commission, resulting from the CITY'S proposed hydroelectric project at the Dock Street Dam.

38. The stated purpose of the Dam project was to repair or replace the Dam and to address deficiencies in Dam safety and fish passage, while maintaining the integrity of the existing waterfront development and associated amenities.

39. In 2001, the River Working Group issued a report discussing the Dam that noted in relevant part, the following:

a. "The purposes of the Dock Street Dam have grown far beyond its original intent to disperse and diffuse municipal sewerage and now it is a major focus for development of municipal and private recreational facilities serving the Greater Harrisburg Regional Area."

b. "There has been substantial public and private investment in the amenities associated with City Island, River Front Park and the pool formed by the Dock Street Dam."

c. "Both public and private investment has developed strictly water related recreational facilities i.e. marinas, boat launches, dockage, boats, Pride of the Susquehanna, beach, beach house, esplanade and steps."

d. "Estimates of the economic value of this recreational development and its use have not been quantified but are believed to be substantial."

e. "The dangerous hydraulic condition below the Dock Street Dam has a long history of being a boating safety hazard with associated loss of life that could be addressed in the design of a new dam."

40. The report identified and analyzed issues associated with alternatives to the CITY'S proposed hydroelectric project.

41.    The report identified as one of the issues, "general site safety and the particularly hazardous conditions associated with the hydraulic backwash" at the Dam, providing in relevant part,

> The second category of dam safety issues is safety "at" the dam. These issues relate to general site safety and the particularly hazardous conditions associated with the hydraulic backwash at run-of-river dams. These safety issues do not fall under the purview of the dam Safety and Encroachments Act but are a legal responsibility of the dam owner as defined in Act 91-1998. The dam owner is responsible for making and keeping the premises safe. The general rule is that a dam owner must avoid conduct or conditions which could injure any person, even one who trespasses. If the dam owner knows that an unsafe condition exists, he is responsible to correct it and/or post warnings.

42.    It is clear from the report that at least as of 2001, the CITY was on notice of the following:

a.    "[G]eneral site safety and the particularly hazardous conditions associated with the hydraulic backwash" at the Dam "are a legal responsibility of the dam owner as defined in Act 91-1998."

b.    "The general rule is that a dam owner must avoid conduct or conditions which could injure any person, even one who trespasses."

c.    "If the dam owner knows that an unsafe condition exists, he is responsible to correct it and/or post warnings."

43.    The report identified seven (7) alternatives to the CITY'S proposed hydroelectric project: no action, removing the Dam, repair or replace the Dam at the same height, or replacing the Dam with one of three higher inflatable Dam options.

44.    Regarding a plan of taking no action at the Dam, the report noted that "No action could result in increased liability issues for the City."

45.    Regarding a plan of removing the Dam, the report noted that "If the Dock Street Dam were removed, safety and liability issues associated with the physical dam would be eliminated."

8

46. The River Working Group estimated that it would cost approximately $300,000 to remove the Dam.

47. Ultimately, the River Working Group recommended "that the existing Dock Street Dam be replaced with an inflatable type dam."

48. The River Working Group noted that "The design of a new inflatable dam could incorporate the results of theoretical and physical hydraulic modeling that would reduce or eliminate any hydraulic backwash effect at normal flows. . . . Also, in late winter and early spring when most tragedies at the dam occur, the dam could actually be deflated."

49. The River Working Group estimated that depending on the elevation height chosen for the new dam, it would cost approximately $10,000,000 to $30,000,000 to replace the Dam.

### E. The Dock Street Dam Has Killed Over 30 People and Injured Many Others

50. Despite owning the Dam and knowing that it was responsible for the maintenance and safety related to same, the CITY did not track the number or identity of persons who had been injured and/or killed by the Dam, or the details of the incidents that resulted in same.

51. Investigative reporters culling through news archives and various CITY agency records, determined that since the CITY built the Dam, the Dam has at least killed over 30 people and injured many others.

### F. Non-Compliance With The Dam Safety Act That Required Signs and Buoys

52. The Commonwealth of Pennsylvania's Act 91 of 1998, signed into law in February 1999 as House Bill 10 of 1999 (Dam Safety Act), requires that owners of low-head-dams, mark the area above and below that dam and on the banks immediately adjacent to the dam with signs and buoys to warn the public of the hazards posed by the dam.

53.     In 1999, the CITY contracted with a third party for the placement and removal of buoys above the Dam, because the CITY did not have the equipment to do the work, and due to the significant danger involved, the CITY did not want its employees to perform these tasks.

54.     In 2018, CITY contracted with a third party for the placement and removal of warning buoys and ground tackle above the Dam, and for storage of same off season.

55.     In May of 2018, after a boating accident at the Dam killed a mother and her young child, the Pennsylvania Fish & Boat Commission ("PFBC") sent a letter to CITY notifying CITY that it was not in compliance with the Dam Safety Act.

56.     The PFBC advised in part that "Owners of dams 200' or more in length are required to install buoys on the upstream and downstream side of the dam when the normal low water level is 3 feet or greater."

57.     The PFBC advised that "These buoys will be installed and maintain a minimum of 200ft on the upstream side and at least 100ft downstream of the maximum boil line."

58.     The PFBC directed the CITY to "submit proof that any and all deficiencies have been corrected, an updated Application to Install Floating Structures and Private Aids to Navigation and a plan detailing what steps will be taken to maintain continued compliance to this office no later than June 15, 2018."

59.     In June of 2018, the Mayor of CITY sent a letter to the PFBC requesting a formal waiver regarding the buoy placement below the Dam based upon the Act 91 requirements because the CITY was unable to find anyone "willing to go below the Dock Street Dam in any water stage or condition to place, to maintain, or to remove buoys."

60.     The Mayor acknowledged that "It is the understanding of the City of Harrisburg that the buoys be placed out during the beginning of the season when the Marina opens, in the middle of March."

61.     The Mayor stated that "We will have the buoys retrieved prior to the ice-jam season to meet the requirements of the Dam Safety Act 91 of 1998."

62.     The Mayor requested on behalf of the CITY that the "waiver request also include the exclusion of the buoy placement and maintenance during the ice-jam season."

63.     Despite the numerous deaths and injuries caused by the Dam, PFBC'S directive to the CITY that it comply with The Dam Safety Act, and the CITY'S acknowledgment of same, from 1998 to the present, the CITY only submitted one "Application for Permit to Install Floating Structures and Private Aids to Navigation" to the PFBC.

64.     That application was filed in 2018.

65.     The application requested a one-year permit, which was granted.

66.     That permit expired on December 31, 2018.

### G.    The Fatal Boating Accident

67.     On Thursday, April 13, 2023, in response to the CITY'S actions to encourage people to visit and use its waterfront for recreation, MICHAEL BROOK and ELIJAH "ELI" ROTHELL travelled to the CITY to go boating and fishing on the Susquehanna River in the recreation area that the CITY created above the Dam.

68.     BROOK and ROTHELL acted reasonably and prudently to ensure that they would be safe.

69.     Before the fishing trip, BROOK had the boat professionally serviced.

70.     During the fishing trip, both BROOK and ROTHELL wore life jackets.

71.    Despite BROOK'S best efforts to ensure that they would be safe, the boat suffered a mechanical failure, stalled, and began to slowly drift downriver.

72.    The river current appeared to be slow and calm, and no danger was visible in front of the boat.

73.    Not seeing any visible danger, BROOK and ROTHELL decided to remain inside of the boat while working to restart the engine.

74.    The warning buoys required by The Dam Safety Act were not present.

75.    As such, BROOK and ROTHELL were not provided with timely and sufficient warning of the hidden deadly condition that they were slowly drifting towards.

76.    Unbeknownst to BROOK and ROTHELL, their boat drifted into the exclusion zone that was not open to the public for recreational use and to the Dam.

77.    By the time that BROOK and ROTHELL discovered that they were in grave danger, it was too late to act to save themselves from the dangerous condition.

78.    The boat went over the Dam and both BROOK and ROTHELL were ejected from the boat.

79.    The boat capsized and the force of the water pressed the boat against the Dam.

80.    ROTHELL observed BROOK'S head surface a couple of times before BROOK disappeared under water.

81.    The force of the water ripped ROTHELL'S life jacket from him.

82.    Fortunately, ROTHELL was able to hold onto the life jacket and wrap it around his arm.

83.    ROTHELL shoved his arm with the life jacket under his chin in an attempt to keep his mouth above water.

84.    Despite his best efforts, ROTHELL was repeatedly forced under water.

85.    Underwater, ROTHELL swam to the bottom, and then pushed off the bottom as hard as he could so that he could get his head above water to take a breath before being forced back underwater.

86.    ROTHELL was terrified and certain that he would die.

87.    Fortunately, two boaters saw what had occurred and risked their lives to get close enough to ROTHELL to throw him a rope and pull him to safety.

88.    Tragically, BROOK drowned to death.

89.    At around 3:00 PM on the same date, BROOK'S body was located in the Susquehanna River near Harrisburg International Airport in Middletown, Pennsylvania.

**H.  The CITY Failed to Maintain the Dam in a Safe Condition in Violation of the Law.**

90.    On Thursday, April 13, 2023, the CITY was required by law to have on each side of the Dam a pair of signs warning that no one is to enter the exclusion zone.

91.    In addition, because the Dam is over 200 feet in length and the water level was in excess of 3 feet, the CITY was required by law to have warning buoys installed and maintained at a minimum of 200 feet on the upstream side, and at least 100 feet below the maximum boil line.

92.    The warning buoys were required to be spaced evenly and not more than 150 feet apart.

93.    The signs and warning buoys above the Dam were required by law to provide people with notice of the dangerous condition that is not visible from above the Dam.

94.    The CITY installed a substandard buoy system that did not stay in place.

95.    The CITY also removed the buoy system from the river.

96.    As a result, when the water was at a level that required by law that the warning buoys be present, the buoys were not present.

**I.  Survivors and Damages**

97.    ROTHEL suffered minor physical injuries but significant mental health injuries that continue to interfere with his daily activities.

98.    BROOK suffered physical injury and death.

99.    BROOK died on April 13, 2023, at the age of 64.

100.    BROOK was married to HIBBLE and still married on the date of his death.

101.    For over thirteen years, BROOK worked at the John Allison Public House, located in Greencastle, Pennsylvania.

102.    BROOK and HIBBLE had shared custody of a minor grandson, CRH.

103.    On the date of BROOK'S death, BROOK was financially supporting his family.

**IV.    CITY IS NOT IMMUNE FROM LIABILITY FOR FEDERAL OR STATE LAW CLAIMS.**

**A.  The City is Not Entitled to Immunity for Federal Civil Rights Claims.**

104.    A municipality may be held liable pursuant to § 1983 for its own violations of federal law.

105.    Policymakers for the CITY decided to construct the Dam and did so.

106.    In doing so, CITY knowingly created a deadly hidden hydraulic.

107.    CITY policymakers decided issues related to access to the Dam, inspection and maintenance of the Dam, and warnings of dangerous conditions associated with the Dam.

108.    Prior to BROOK being killed and ROTHELL being injured, the CITY was on notice of the dangerous condition that it created in that approximately 30 people had previously drowned at the Dam, and countless other were injured.

109.    The repeated taking of life as a result of a state-created danger that CITY created and did not remedy despite substantial notice and opportunity, constitutes a violation of the Federal Fourteenth Amendment guarantee of Due Process for which CITY may be held liable.

**B.    The CITY Is Not Immune From Liability Pursuant to the Recreational Use of Land and Water Act ("RUA") for State Law Claims Pled in the Alternative.**

110.    The CITY is not entitled to immunity pursuant to the Recreational Use of Land and Water Act, 68 P.S. § 477-1 *et seq.* ("RUA").

111.    The CITY invested a significant amount of money into developing the entire waterfront in CITY.

112.    The CITY constructed the Dam on publicly owned land, not in a remote location, as part of a significant development project that encompassed the entirety of the CITY'S waterfront.

113.    The CITY constructed the Dam across the entire width of the Susquehanna River with the CITY side of the Dam connecting to Riverfront Park.

114.    The Dam that the CITY constructed constitutes an improvement to land that comes with it a duty to conduct inspections and maintenance, and to warn about dangerous conditions.

115.    The Dam that the CITY constructed significantly altered the river from its natural state by creating a deadly hydraulic that was hidden from view upstream.

116.    The deadly hydraulic is not in any way like the flow of a river in its natural state.

117.    As a result, the CITY created an exclusion zone above and below the Dam that was *not* available for recreational use or used as such.

118.    The CITY, however, did not prevent the public from entering the exclusion zone.

119.    The accident that caused BROOK and ROTHELL'S injuries and/or death occurred at the Dam in the exclusion zones.

120.    BROOK and ROTHELL did not intentionally enter the exclusion zone for the purpose of recreation.

121.    Rather, BROOK and ROTHELL were in a stalled boat that slowly drifted downriver while it was in the process of being repaired.

**C. The CITY Is Not Immune From Liability Pursuant to the Political Subdivision Tort Claims Act (PSTCA) for State Law Claims Pled in the Alternative.**

122.    Pursuant to 42 Pa.C.S. § 5522(a)(1) a tort claim notice was not required prior to the filing of civil litigation against the CITY because the CITY had actual notice of the incident and the dangerous condition that caused it.

123.    Regardless, Plaintiffs timely served the MAYOR of the CITY with a tort claim notice.

124.    The CITY is not entitled to immunity pursuant to the Political Subdivision Tort Claims Act (PSTCA), 42 Pa.C.S. §§ 8541 *et seq.*

125.    The damages sought in this matter would be recoverable under common law or a statute creating a cause of action if the injury were caused by a person who did not enjoy immunity.

126.    BROOK and ROTHELL'S injuries were caused by the negligent acts of the CITY or an employee thereof acting within the scope of his/her office or duties.

127.    The accident occurred on real property that was in the care, custody, and/or control of the CITY.

128.    BROOK and ROTHELL did not intentionally trespass onto the property.

129.    The CITY intentionally installed an inadequate buoy system in the river as its purported warning of the hidden danger.

130.    As a result, the buoys moved and/or disappeared.

131.   The CITY intentionally removed the buoys from the river during times when the river was at a level that by law, warning buoys were required to be present in specific places.

132.   Had CITY not constructed the Dam and dangerous hydraulic, BROOK and ROTHELL would not have been injured and/or killed.

133.   Had BROOK and ROTHELL been unable to enter the exclusion zone, they would not have been injured and/or killed.

134.   Had BROOK and ROTHELL been provided with sufficient and timely warning that was required by law to be provided to them, they would have exited the boat and gotten to safety well before they reached the hidden deadly hydraulic created by the CITY.

## V.   LEGAL CLAIMS[1]

### Count I

**PLAINTIFFS v. CITY OF HARRISBURG, PENNSYLVANIA**
**Fourteenth Amendment—State Created Danger**
*Pursuant to 42 U.S.C. § 1983*

135.   Paragraphs 1 to 134 are incorporated herein by reference.

136.   The government has an obligation pursuant to the Federal Fourteenth Amendment's Due Process Clause "to protect individuals against dangers that the government itself creates." Haberle v. Troxell, 885 F.3d 171, 176 (3d Cir. 2018).

137.   A relationship existed between the CITY, BROOK, and ROTHELL, in that BROOK and ROTHELL were members of a discrete class of persons – boaters in the exclusion zones – subjected to the potential harm brought about by the CITY'S actions: (a) building a

---

[1] In a Complaint, a Plaintiff is only required to plead facts, not legal theories. See Johnson v. City of Shelby, 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U. S. 544, 569-70 (2007); Ashcroft v. Iqbal, 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." FED.R.CIV.P. 8(d)(1).

dangerous hidden hydraulic across the entirety of the river, (b) installing a substandard buoy warning system, and (c) removal of most/all of the and/or removal of the buoy warning system.

138.    A relationship existed between the CITY, BROOK, and ROTHELL, in that BROOK and ROTHELL were members of a discrete class of persons – boaters in the exclusion zones – and the Dam Safety Act imposed a duty on the CITY to warn boaters (such as the Plaintiffs) in the exclusion zones.

139.    Plaintiffs assert this claim against the CITY because the CITY, through its policymakers, *acted* in willful disregard for the safety of a specific group of people of which the Plaintiffs were members when the policymakers of the CITY created the hidden dangerous condition.

140.    The boaters are a discrete identifiable group of people, not just the general public.

141.    Plaintiffs assert this claim against the CITY because the harm that they suffered as members of a specific group of people was foreseeable and direct to the policymakers of the CITY.

142.    The policymakers of the CITY used their authority in a manner that created a hidden deadly condition that created a danger, not to the general public, but rather to a specific group of people of which the Plaintiffs were members.

143.    The policymakers of the CITY used their authority in a manner that rendered the Plaintiffs, as members of a specific group of persons, more vulnerable to danger than had the policymakers of the CITY never acted.

144.    The CITY, through its policymakers, built the Dam and the deadly hydraulic.

145.    The CITY, through its policymakers, knew that the Dam and hydraulic were not visible to boaters upstream.

146.    The CITY, through its policymakers, knew that approximately 30 people had

drowned and numerous others injured as a direct result of the dangerous condition that CITY constructed.

147.    The CITY, through its policymakers, knew that warning buoys were required by law to be placed above the Dam to prevent the exact type of harm that occurred in this incident.

148.    The CITY, through its policymakers, understood its legal duty as evidenced by applying for and obtaining a permit in 2018 related to the installation of warning buoys.

149.    On dates after 2018 but before the date of this incident, the CITY, through its policymakers, installed a substandard buoy system that did not remain in place and/or disappeared.

150.    On dates after 2018 but before the date of this incident, the CITY, through its policymakers, removed the warning buoys that were required to be in place on the date in question.

151.    The harm ultimately caused BROOK and ROTHELL was foreseeable and direct.

152.    The CITY, through its policymakers,  acted with a degree of culpability that shocks the conscious.

153.    A relationship between the CITY, BROOK, and ROTHELL, existed such that BROOK and ROTHELL, as members of a specific group of persons as opposed to the general public, were foreseeable victims of CITY'S actions.

154.    It is foreseeable that the installation of a substandard buoy system and/or removal of buoys intended to warn of hidden danger created by the CITY, after notice of approximately 30 previous deaths, would place persons in the exclusion zones in danger.

155.    Only the CITY and its policymakers had the authority to construct the Dam and deadly hydraulic.

156.    Had the CITY and its policymakers not built the Dam and not created the dangerous hydraulic, BROOK and ROTHELL would not have been injured and/or killed.

157.    Only the CITY and its policymakers had the authority to install and/or remove the warning buoys.

158.    Had the CITY and its policymakers not acted to install a substandard buoy system and/or not removed the buoys required by law, BROOK and ROTHELL would not have been injured and/or killed.

159.    As a direct and proximate result of CITY'S conduct, BROOK and ROTHELL suffered physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and/or death.

160.    As a direct and proximate result of CITY'S conduct, PLAINTIFFS will incur attorneys' fees and litigation costs.

**Count II**

**PLAINTIFFS v. CITY OF HARRISBURG, PENNSYLVANIA**
**Fourteenth Amendments—Monell Liability**
***Pursuant to 42 U.S.C. § 1983***

161.    Paragraphs 1 to 160 are incorporated herein by reference.

162.    "Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 (1978).

163.    The state created danger resulted from decisions officially adopted and promulgated by CITY policymakers.

164.    When policymakers act on behalf of the CITY or collectively as the CITY, the policymaker's actions set the policy for the CITY.

165.    The aforementioned actions of the CITY through its policymakers set a policy that was the moving force that cause the Plaintiffs' constitutional injuries.

166.    As a direct and proximate result of CITY'S conduct, BROOK and ROTHELL suffered physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and/or death.

167.    As a direct and proximate result of CITY'S conduct, PLAINTIFFS will incur attorneys' fees and litigation costs.

## Count III

**PLAINTIFFS v. CITY OF HARRISBURG, PENNSYLVANIA**
**Negligence**
*Pursuant to Pennsylvania Law*
*Pled in the Alternative*

168.    Paragraphs 1 to 134 are incorporated herein by reference.

169.    As a result of the CITY'S willful and malicious failure to warn of a dangerous hidden condition that it created on land that it improved but that was not open for recreational use (the exclusion zone and dam), the CITY is not immune pursuant to the Pennsylvania's Recreation Use of Land and Water Act ("RULWA"), 68 P.S. §§ 477-1-8.

170.    The CITY is also not immune pursuant to the Political Subdivision Tort Claims Act (PSTCA) because the Plaintiffs were *not* intentionally trespassing on CITY'S property when they encountered the hidden dangerous condition created by the CITY.

171.    The CITY constructed and owns the Dam and the dangerous hidden hydraulic.

172.    The Dam contained a realistically predictable danger of the harm suffered, the CITY had actual notice of the potential danger and notice in a sufficient amount of time prior to the incident that CITY could have prevented BROOK and ROTHELL'S injuries and/or death.

173.    The CITY breached its duty in that it failed to remove the hidden hydraulic that it

constructed with the Dam.

174.    The CITY breached its duty in that it failed to sufficiently and timely warn of the hidden hydraulic that it constructed with the Dam.

175.    The CITY'S breach of its duties was the direct cause of BROOK and ROTHELL'S injuries and/or death.

176.    The CITY'S breach of its duty caused Plaintiffs to suffer the damages alleged herein.

177.    As a direct and proximate result of CITY'S conduct, BROOK and ROTHELL suffered physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and/or death.

### Count IV

**PLAINTIFF HIBBLE v. CITY OF HARRISBURG, PENNSYLVANIA**
**Survival Claim**
*Pursuant to Pennsylvania Law*

178.    Paragraphs 1 to 134 are incorporated herein by reference.

179.    HIBBLE is the duly appointed Administratrix of BROOK'S estate.

180.    HIBBLE asserts this claim to recover the loss to the Estate caused by the Defendant's tortious conduct.

181.    As a direct and proximate result of CITY'S conduct, BROOK suffered physical and psychological harm, pain and suffering, life-threatening injuries, loss of enjoyment of life, and/or death.

## Count V

**PLAINTIFF HIBBLE v. CITY OF HARRISBURG, PENNSYLVANIA**
**Wrongful Death Claim**
***Pursuant to Pennsylvania Law***

182.     Paragraphs 1 to 134 are incorporated herein by reference.

183.     HIBBLE is BROOK'S surviving wife and stands in *loco parentis* to CRH.

184.     HIBBLE asserts this claim to recover the loss suffered by BROOK'S beneficiaries caused by the Defendant's tortious conduct.

185.     No such claim was asserted seeking the same damages during BROOK'S lifetime.

186.     As a direct and proximate result of CITY'S conduct, BROOK'S beneficiaries suffered damages recoverable pursuant to 42 Pa.C.S. § 8301.

## VI.  REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that judgment be entered in their favor as follows:

A.     **Declaratory Judgment:** Providing that the Dam is a state created danger.

B.     **Compensatory Damages:** Including, but not limited to, the monetary value associated with the following: violations of legal rights, embarrassment, humiliation, physical and psychological harm, pain and suffering, loss of consortium, life-threatening injuries, loss of enjoyment of life, and/or death;

C.     **Punitive Damages** if permitted by law;

D.     **Equitable Relief:** An Order directing CITY to bring the Dam into compliance with the Dam Safety Act and requiring independent oversight of same. An Order directing CITY to remove the dangerous hydraulic.

E.     **Attorney's Fees and Costs**; and

F.    **Discretionary Damages and Relief:** Such other financial or equitable relief that the Court deems reasonable and just.

## VII.  <u>JURY TRIAL DEMAND</u>

Plaintiffs respectfully request a trial by jury on all claims/issues in this matter that may be tried to a jury.

**Respectfully Submitted,**

_____                **Date: July 14, 2025**

**DEVON M. JACOB, ESQUIRE**
PA Bar Number: 89182
**JACOB LITIGATION, INC.**
P.O. Box 837, Mechanicsburg, Pa. 17055-0837
717.796.7733 | djacob@jacoblitigation.com

*Plaintiffs' Counsel*

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ELIZABETH A. HIBBLE, Personally, on behalf of CRH a minor, and as the Administratrix of the ESTATE OF MICHAEL W. BROOK; and ELIJAH L. ROTHELL;** | **No. 1:25-cv-00636** |
| **Plaintiffs;** | **District Judge: Jennifer P. Wilson Magistrate Judge:** |
| **v.** | **CIVIL ACTION-LAW** |
| **CITY OF HARRISBURG, PENNSYLVANIA;** | **JURY TRIAL DEMANDED** |
| **Defendant.** | |

---

## CERTIFICATE OF SERVICE

I, Devon M. Jacob, Esquire, hereby certify that on the below referenced date, I served a true and correct copy of this First Amended Complaint, via ECF, on all counsel of record.

**Respectfully Submitted,**

**s/ _Devon M. Jacob_**                                            **Date: July 14, 2025**
**DEVON M. JACOB, ESQUIRE**

25