# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ELIZABETH A. HIBBLE, *Personally, on behalf of CRH, a minor, and as the Administratrix of the Estate of Michael W. Brook*, and ELIJAH L. ROTHELL, | : : : : : : | Civil No. 1:25-CV-00636 |
| Plaintiffs, | : : | |
| v. | : : | |
| CITY OF HARRISBURG, PENNSYLVANIA, | : : : | |
| Defendant. | : : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This case arises from a fatal boating accident.  A mechanical failure caused the boat carrying Michael Brook ("Brook") and Elijah Rothell ("Rothell") to drift over the Dock Street Dam ("Dam") in the Susquehanna River.  While Rothell was fortunate to survive, Brook tragically drowned.  Rothell and the Administratrix of Brook's estate, Elizabeth Hibble (collectively with Rothell, "Plaintiffs") now sue the Dam's owner, the City of Harrisburg ("Harrisburg").  Presently before the court is Harrisburg's motion to dismiss.  The primary issue presented is whether Plaintiffs have adequately pleaded a violation of their due process rights under the state-created danger theory.  They have not.  So the court will grant Harrisburg's motion.

**BACKGROUND**

**A. Facts**

The Dam crosses the Susquehanna River between Harrisburg and the Borough of Lemoyne. (Doc. 19, ¶ 20.) Standing about six feet tall, the dam is relatively inconspicuous and impossible to see when traveling downriver. (*Id.* ¶¶ 22, 36.) Harrisburg built the Dam in 1913 for three reasons: (1) "to eliminate stagnant mosquito-breeding pools"; (2) to "control odors by submerging sewer pipe outlets"; and (3) to create a recreational lake three miles upstream. (*Id.* ¶¶ 23, 24.)

The Dam is a particular type of dam known as a "a run-of-the-river low-head dam." (*Id.* ¶ 21.) This type of dam is allegedly referred to as "drowning machines," *id.* ¶ 35, due to their creating a dangerous phenomenon known as a "submerged hydraulic jump" or "roller." (*Id.* ¶ 28.) As water continuously flows over the Dam, it entrains air into the water below. (*Id.* ¶ 30.) The entrained air makes the water at the Dam's base less dense and, therefore, reduces the buoyancy of whatever is in the water. (*Id.* ¶ 31.) Due to the reduced buoyancy and the recirculating currents created by the Dam, whatever is in the water at the Dam's base will sink. (*See id.* ¶ 32) The river's ordinary current will then push whatever has sunk downstream, where the water is less aerated. (*Id.*) Buoyancy increases in the less aerated water, causing whatever has sunk to resurface. (*Id.* ¶¶ 32, 33.) At

the surface, however, the recirculating currents return the resurfaced item to the base of the dam, thereby restarting the loop.  (*Id.* ¶ 33.)  These currents "are too strong for even experienced swimmers to escape."  (*Id.* ¶ 34.)

Indeed, the Dam has been the source of injury and death.  Harrisburg allegedly does not track the number or identity of Dam-related victims.  (*Id.* ¶ 50.) But news archives and Harrisburg agency records allegedly suggest that since being built, "the Dam has at least killed over 30 people and injured many others." (*Id.* ¶ 51.)  Harrisburg was allegedly aware of the Dam's long history of dangerous conditions as early as 2001.  (*Id.* ¶ 39.)  It also was allegedly aware that, as the Dam owner, it had an obligation to comply with Pennsylvania's Act 91 of 1998 ("Dam Safety Act").  (*Id.* ¶ 41.)

The Dam Safety Act allegedly requires, *inter alia*, low-head dam owners to place warning signs and/or buoys upstream and downstream from their dams as well as on the bank adjacent to them.  (*Id.* ¶ 52.)  Harrisburg allegedly twice attempted to place warning buoys in the Susquehanna River near the Dam, once in 1999 and again in 2018.  (*Id.* ¶¶ 53–54.)  These attempts seemingly failed, as the buoys were allegedly removed each time.  (*See id.*)  In 2018, after a mother and her child were killed at the Dam in a boating accident, the Pennsylvania Fish & Boat Commission ("PFBC") directed Harrisburg to comply with the Dam Safety Act by installing the required warning buoys.  (*Id.* ¶¶ 55–56.)  Despite this admonition,

Harrisburg allegedly did not install any sort of enduring buoys and, rather, requested a formal waiver from the Dam Safety Act's requirement.  (*See id.* ¶¶ 59–66.)  Plaintiffs do not allege whether Harrisburg ultimately received the waiver.

This background sets the stage for the events that give rise to the present lawsuit.  On April 13, 2023, Brook and Rothell took the former's boat out on the Susquehanna River to go boating and fishing in the recreational area upstream from the Dam.  (*Id.* ¶ 67.)  Despite being recently serviced, Brook's boat suffered a mechanical failure and stalled.  (*Id.* ¶¶ 69, 71.)  The two began drifting downstream and eventually entered a non-recreational "exclusion zone" directly near the Dam.  (*Id.* ¶ 76.)  No warning buoys were present to demarcate the exclusion zone, despite Harrisburg's alleged legal obligation to place such buoys. (*Id.* ¶¶ 90, 95, 96.)

The boat went over the Dam, which caused Brook and Rothell to be ejected from the boat into the currents of the submerged hydraulic pump.  (*See id.* ¶ 78.) The pair struggled to stay afloat and were repeatedly sucked under water.  (*Id.* ¶¶ 80, 84.)  Fortunately, Rothell was able to repeatedly push off the river floor in order to get his head above water long enough to take a breath.  (*Id.* ¶ 85.) Tragically, Brook drowned.  (*Id.* ¶ 88.)  Rothell was eventually rescued by two boaters who courageously approached close enough to pull him to safety.  (*Id.* ¶ 87.)  This lawsuit followed.

### B.  Procedural History

Plaintiffs filed their complaint on April 9, 2025.  (Doc. 1.)  Harrisburg responded with a motion to dismiss.  (Doc. 12.)  That motion was stricken due to defense counsel's omission of the required certification of conference.  (Doc. 13.)  Harrisburg was permitted, however, to refile its motion.  (*Id.*)  It did so along with a brief in support on June 30, 2025.  (Docs. 16 & 17.)  Plaintiffs responded to the properly filed motion to dismiss with an amended complaint.  (Doc. 19.)

The amended complaint alleges the same core set of facts and causes of action as the original.  (*Compare* Doc. 1, *with* Doc. 19.)  The claims are made under federal and state law.  The federal claim is a state-created danger claim brought pursuant to 42 U.S.C. § 1983.  (Doc. 19, ¶¶ 135–60.)  The Pennsylvania state claims consist of a negligence claim, a survival claim, and a wrongful-death claim.  (*Id.* ¶¶ 168–86.)

In response to the amended complaint, Harrisburg renewed its motion to dismiss.  (Doc. 22.)  The brief in support of this second motion is virtually identical to its brief in support of the first.  (*Compare* Doc. 17, *with* Doc. 23.)  The court has reviewed Harrisburg's motion, brief in support, and reply brief together with Plaintiffs' brief in opposition.  (Docs. 22, 23, 27, 30.)  The motion is now ripe for adjudication.

## JURISDICTION

This court's subject matter jurisdiction over Plaintiffs' § 1983 claim derives from 28 U.S.C. §§ 1331, 1343.  The court may exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper in this court pursuant to 28 U.S.C. § 1391(b).

## STANDARD OF REVIEW

In order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Twombly*, 550 U.S. at 556).  "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.  *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).  To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to

relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012) *abrogated on other grounds as recognized in Mack v. Yost*, 968 F.3d 311, 319 n. 7 (3rd Cir. 2020).

DISCUSSION

Harrisburg identifies two reasons the court should dismiss Plaintiffs' state-created danger claim. The first is a failure to adequately allege certain elements of the claim. The second is a failure to satisfy the municipal-liability standard set forth in *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). Harrisburg further argues the court should decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims. The court explores these issues, as necessary, in turn.

**A. State-Created Danger Claim**

The Due Process Clause of the Fourteenth Amendment imposes a prohibition on the "State" from depriving individuals of life, liberty, or property without due process of law. *DeShaney v. Winnebago Cty. Dep't of Social Servs.*, 489 U.S. 189, 195 (1989). It does not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* Accordingly, "[a]s a general matter, . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. This principle comports "with our general conception of the Constitution as a document of negative restraints, not positive entitlements."

7

*Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995); *accord Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) ("[W]e have repeated many times, the Constitution, insofar as it creates or protects liberties, is . . . a charter of *negative* liberties.")

Nevertheless, two exceptions to this general rule exist. *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006). One applies when a "special relationship" exists between the state and an individual. *Id.* This exception is "very limited" and "requires a custodial relationship," *id.* n.4, such as "incarceration, institutionalization, or other similar restraints of personal liberty." *D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1370 (3d Cir. 1992) (quoting *DeShaney*, 489 U.S. at 200). Plaintiffs disclaim any reliance on this exception. (Doc. 27, p. 3 n.2.)

Instead, they rely solely on the second exception, which arises "when a 'state-created danger' is involved." *Sanford*, 456 F.3d at 304. Simply put, a state "assumes" a "duty to keep people safe . . . 'when it affirmatively places [a] person in a position of danger [that] the person would not otherwise have faced.'" *Mears v. Connolly*, 24 F.4th 880, 883 (3d Cir. 2022) (quoting *Kamara v. Att'y Gen. of U.S.*, 420 F.3d 202, 216 (3d Cir. 2005)).

To plead a constitutional violation under the state-created danger theory, Plaintiffs must adequately allege four elements:

(1) the harm ultimately caused was foreseeable and fairly direct;

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sanford*, 456 F.3d at 304–05 (quoting *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006)).

Harrisburg contends that Plaintiffs have failed to plausibly plead the third and fourth elements.[1]  (Doc. 23, pp. 10–11.)  The court agrees with respect to the third element, so it need not analyze the fourth.

Despite similar nomenclature, the relationship element of a state-created danger claim does not require the same custodial relationship contemplated by the "special relationship" theory.  *Kneipp v. Tedder*, 95 F.3d 1199, 1209 n. 22 (3d Cir. 1996).  Rather, the element "contemplates some contact such that the plaintiff was a foreseeable victim of a defendant's acts in a tort sense."  *Id.*  This does not mean

---

[1] Harrisburg also argued for the first time in its reply brief that Plaintiffs failed to adequately allege elements one and two.  (Doc. 30, pp. 7–12.)  That argument comes too late.  The court will not consider arguments first made in a reply brief.  *United States v. Brabham*, No. 21-cr-00342, 2024 WL 897834, at *6 n.8 (M.D. Pa. Mar. 1, 2024).

that state-created danger claims are limited to "instances where a specific individual is placed in danger." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 913 (3d Cir. 1997). A plaintiff may also "bring a state-created danger claim if the plaintiff was a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Id.*

A discrete class is "limited in both time and scope." *Crockett v. Se. Pa. Transp. Ass'n*, No. 12-cv-4230, 2013 WL 2983117, at *6 (E.D. Pa. June 14, 2013) (quoting *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 828 (7th Cir. 2009)). By definition, "only a limited group of potential plaintiffs" can be members of a discrete class. *Morse*, 132 F.3d at 913 n.12. So a plaintiff cannot be said to be "part of a discrete class" if "thousands, or even hundreds, of people" risk the same harm or if that "risk[] exists for an 'indefinite' duration of time." *Crockett*, 2013 WL 2983117, at *6.

The restrained scope of state-created danger claims serves an important purpose, which "is to circumscribe the number of potential plaintiffs stemming from any particular exercise of state authority and shield state actors from liability for any act for which any member of the general public could sue." *O'Donnell v. Scranton Sch. Dist.*, 615 F. Supp. 3d 262, 280 (M.D. Pa. 2022) (quoting *Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676, 688 (D.N.J. 2014)). This point is worth stressing. State-created danger claims do not permit plaintiffs to sue for

10

harm caused by "danger [directed] towards the public generally." *Morse*, 132 F.3d at 913 n.12. Permitting so would "would expand the scope of the state-created danger theory beyond its useful and intended limits." *Id.* After all, it is well settled that "the Due Process Clause of the Fourteenth Amendment . . . does not transform every tort committed by a state actor into a constitutional violation." *DeShaney*, 489 U.S. at 202; *accord County of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998) ("[W]e have made it clear that the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm."); *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992) ("[W]e have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law . . . ."); *Daniels v. Williams*, 474 U.S. 327, 332 (1986) ("Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society."); *Paul v. Davis*, 424 U.S. 693, 701 (1976) (rejecting the notion that the Due Process Clause is "a font of tort law to be superimposed upon whatever systems may already be administered by the States").

Plaintiffs insist they are members of the following discrete class: "boaters in the exclusion zone." (Doc. 19, ¶ 137.) Plaintiffs define the class as such

seemingly because they claim the Dam Safety Act was passed in order to protect boaters and, therefore, Harrisburg owed a duty to that class. (*See* Doc. 27, pp. 9–10.) Plaintiffs cite no authority to suggest that courts should define a "discrete class" in cases like this by considering whether the defendant had a statutory duty towards a particular group. Such a method is untenable, since it would effectively and wrongly transform every statutory duty into a constitutional one.[2] *See DeShaney*, 489 U.S. at 202.

Putting this aside, Plaintiffs argue that their purported class is sufficiently discrete because it is limited to "specific people in a specific location." (Doc. 27, p. 9.) Upon closer examination, however, the metes and bounds of Plaintiffs' supposedly discrete class vanish, revealing that the class subjected to potential harm by the Dam is not as discrete as Plaintiffs suggest.

To begin, Plaintiffs' proposed class is underinclusive with respect to both persons subject to the risk of harm and the geographic scope of where that risk exists. The Dam creates a risk for many more people than just boaters in the exclusion zone. Anyone on or in the Susquehanna River near the Dam would face the same risk, whether they are boaters or a person who by happenstance finds themselves in the river near the Dam. Moreover, the tragic facts of this case

---

[2] The court takes no position on whether Harrisburg, in fact, had such a duty under the Dam Safety Act.

illustrate that the risk of harm is present far beyond the exclusion zone.  Plaintiffs

never intended to enter the exclusion zone; they drifted three miles from the

recreational lake into it due to the malfunction of Brook's boat.  (*See* Doc. 19, ¶¶

24, 67, 71, 76.)

Such a class will not support a state-created danger claim in any event.  As

seen in an analogous case involving an allegedly dangerous road design, the

Eastern District of Pennsylvania rejected the plaintiffs' proposed class of "drivers

on Route 1."  *Solum v. Yerusalim*, No. 98-cv-4056, 1999 WL 395720, at *5 (E.D.

Pa. June 17, 1999), *aff'd*, 211 F.3d 1262 (3d Cir. 2000).  That court reasoned the

class did not actually represent who faced the dangers of the road design, since

"[n]o reason exist[ed] for providing recovery to drivers and not passengers."  *Id.*

So, too, here, no reason exists for ignoring the potential dangers faced by non-

boaters such as their passengers or others who are in the river.  Similarly, when a

plaintiff was injured in an alley by a recklessly driving police officer, this court

rejected the proposed class that only encompassed those living along the alley

where the plaintiff lived.  *Long v. Rogers*, No. 24-cv-00128, 2025 WL 26869, at *5

(M.D. Pa. Jan. 3, 2025).  The court reasoned, "[t]he harm here . . . is a harm faced

by the whole jurisdiction [in which the officer worked], not just those living along

the alley."  *Id.*  Likewise, here, the risk of harm created by the Dam reaches

beyond the exclusion zone.

Even if one defined the class as anyone in the Susquehanna River within a reasonable distance of the Dam, that still would not be sufficiently discrete. Cases involving traffic-related dangers prove usefully analogous. In those cases, courts have consistently rejected proposed classes involving all travelers on a particular road. In *Solum*, for example, the court explained that "travelers on Route 1" is a class that "contains an unquantifiable and virtually unidentifiable mass of potential plaintiffs." 1999 WL 395720, at *5; *cf. Hammon v. Kennett Twp.*, 746 F. App'x 146, 149 (3d Cir. 2018) ("[W]e have held that drivers on a particular road are not identifiable [as a discrete class]."); *Stover v. Camp*, 181 F. App'x 305, 308 (3d Cir. 2006) (holding that a class comprised of "persons who regularly traveled on Atlas-Cherry Valley Road" was not a discrete class); *Watson v. Methacton Sch. Dist.*, 513 F. Supp. 2d 360, 377 (E.D. Pa. 2007) (explaining that a class of "motorists traveling within the 'vicinity'" of a school—which would encompass drivers within a 19.3-mile radius—"suffers from the same problems of breadth as the class that was rejected in *Solum*"). There is no meaningful distinction between defining a class as all travelers on a road versus all those who use a river. In both instances, the proposed class contains an indeterminate number of potential plaintiffs.

This breadth issue is exacerbated here because the risk of harm created by the Dam is not temporally limited. The Dam was built in 1913, Doc. 19, ¶ 19, meaning the dangers created by the Dam have existed for approximately 113 years

and will presumably exist for as long as the Dam remains in its current state. A risk of such indefinite duration strongly suggests that the danger is directed at the public, not at a discrete class. *Compare, e.g.*, *Chickis v. Campbell*, No. 24-cv-673, 2025 WL 346554, at *6 (W.D. Pa. Jan. 30, 2025) (finding that a danger was directed towards the general public when it "existed for an indefinite period of time" and "[a]nyone who drove that road 'for years' was potentially subject to the same danger."), *with Van Orden*, 5 F. Supp. 3d at 688 (finding danger was not directed at the public—when a mother drowned in her car after officials opened a dam's floodgates without closing an affected road—in part because the "[o]pening of the floodgates did not create an ongoing threat" that lasted months or years).

Ultimately, naming a supposedly discrete class is not enough to adequately plead a state-created danger claim. *Solum*, 1999 WL 395720, at *5. Yet, that is all Plaintiffs have done. They have failed to allege that Brook and Rothell faced a danger distinguishable from that directed at the general public. Accordingly, if permitted to proceed, Plaintiffs' claim "would expand the scope of the state-created danger theory beyond its useful and intended limits." *Morse*, 132 F.3d at 913 n.12. For this reason, the court will dismiss Plaintiffs' § 1983 claim.

Dismissal will be with prejudice. Plaintiffs amended their complaint in response to Harrisburg's first motion to dismiss. The amended complaint does not include any materially different factual allegations than the original. (*Compare*

Doc. 1, *with* Doc. 19)  In response to the amended complaint, Harrisburg filed a second motion to dismiss with a brief in support that was virtually identical to the brief in support of the first motion.  (*Compare* Doc. 17, *with* Doc. 23.)  Therefore, Plaintiffs were on notice of their claim's potential defects and did not remedy them in amending their complaint.  Under these circumstances, the court finds that further amendment would be futile.  *Mims v. City of Philadelphia*, No. 09-cv-4288, 2010 WL 2077140, at *14 (E.D. Pa. May 19, 2010).

### B. *Monell* Liability

Plaintiffs have failed to adequately allege a state-created danger claim for the reasons set forth above.  Thus, the court need not consider whether Plaintiffs satisfied the *Monell* framework.

### C. Supplemental Jurisdiction

The court now must decide whether to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  The supplemental jurisdiction statute states, in relevant part, that this "court[] may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  As § 1367 makes plain, the decision to exercise supplemental jurisdiction lies within the court's discretion.  *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009).  The exercise of discretion, however, "should be based on considerations of 'judicial economy, convenience and fairness to the

litigants.'" *Id.* (quoting *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996)). Ordinarily, "courts . . . decline to exercise supplemental jurisdiction when all federal claims have been dismissed and only state law claims remain." *Chapman v. United States*, 480 F. Supp. 3d 601, 614 (M.D. Pa. 2020); *accord United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

Plaintiffs argue that the court should exercise supplemental jurisdiction, because their case is likely to involve federal law issues if the court grants their request for equitable relief. (Doc. 27, pp. 13–14.) The equitable relief sought is an order directing Harrisburg to comply with the Dam Safety Act and to remove the hydraulic pump. (Doc. 19, p. 23.) Plaintiffs' position that this relief will trigger federal law issues is premised on previous litigation that occurred when Harrisburg attempted to replace the Dam with a hydroelectric project. (Doc. 27, p. 13.) According to Plaintiffs, Harrisburg attempted to get a license for that project from the Federal Energy Regulatory Commission ("FERC"), which required the city to obtain a Clean Water Act certification from the Pennsylvania Department of Environmental Protection ("PADEP"). (*Id.*) PADEP denied the certification request and litigation ensued. (*Id.* at 14.) Plaintiffs argue that if they obtain the

equitable relief sought, Harrisburg would be forced to pursue the hydroelectric

project and litigation with FERC would necessarily follow. (*Id.*)

Plaintiffs assume a lot. They assume their state law claims will succeed; that

they will be awarded equitable relief; that Harrisburg will want to pursue a

hydroelectric project to comply with a hypothetical injunction; that FERC and

other governmental agencies will oppose such a project; that litigation over federal

law issues will flow from this opposition; and that the litigation will proceed in the

context of this case. This chain of assumptions is simply too speculative to depart

from the typical rule that dismissal of the state claims is preferred. Accordingly,

the court will dismiss Plaintiffs' state law claims without prejudice. *See Booth v.*

*Drissell*, No. 23-3004, 2024 WL 3811624, at *2 n.5 (3d Cir. Aug. 14, 2024)

("When a district court declines to exercise supplemental jurisdiction, as here

under 28 U.S.C. § 1367(c)(3), or otherwise, dismissal of the state law claims

should be without prejudice.").

### D. Consequences of Dismissal

In their briefing, Plaintiffs highlight what they see as the consequences that

dismissal of this litigation will have in preventing future harm by the Dam. They

write:

> The simple truth is that if the Court grants the Defendant's Motion to
> Dismiss, business will continue as usual, and the 30-person death toll
> will rise. This is because if the Court puts the Plaintiffs out of federal
> court, the City's exposure in this and the next death cases will be limited

to $500,000 *per incident* (not per death) with no requirement that the City even pay attorney's fees and litigation costs (which will further discourage litigation). If, however, the Court denies the City's motion, the cost risk to the City in continuing business as usual is simply too high.

As previously stated in response to the City's Motion to Disqualify, few issues are truly a matter of life and death. But with now over 30 deaths and over 30 near deaths already, it is not a question of whether another person will die, but rather when the next person will die. This is evidenced by the fact that since the filing of this lawsuit, two additional people were almost killed by the Defendant's continuing conduct.

At the risk of sounding overly dramatic, how the Court decides the Defendants' Motion to Dismiss is a matter of life and death. If the Court denies the City's motion, the City will have no choice but to correct the hidden dangerous condition that it created. On the other hand, if the Court grants the City's motion, more people will die.

(Doc. 27, pp. 3–4 (footnote omitted).) The court would be remiss not to address this argument.

Plaintiffs are clearly concerned that the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA") will limit Harrisburg's potential liability on their state law claims. *See generally* 42 Pa. Cons. Stat § 8553 (PSTCA's limitations-on-damages provision). They are also concerned that limiting Harrisburg's potential liability will correspondingly reduce the city's motive to remediate the Dam's propensity to cause harm. These are understandable concerns. But Plaintiffs invite the court to ignore its judicial duty because of these concerns. This is an invitation the court must emphatically decline.

19

The court renders judgments by applying the law to the facts of each case. No room exists in this decisionmaking process to consider the wisdom of legislation, like the PSTCA.  *See Ferguson v. Skrupa*, 372 U.S. 726, 730 (1963) ("[C]ourts do not substitute their social and economic beliefs for the judgment of legislative bodies, who are elected to pass laws."); *Louisville & Nashville R.R. Co. v. Kentucky*, 183 U.S. 503, 512 (1902) ("It is scarcely necessary to say that courts do not sit in judgment on the wisdom of legislative or constitutional enactments."). To permit such room would risk forsaking the principle that courts "do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare." *Day-Brite Lighting Inc. v. Missouri*, 342 U.S. 421, 423 (1952).  If Plaintiffs wish to argue that the PSTCA—a duly enacted statute of Pennsylvania—is an obstruction to eliminating the Dam's dangers, the proper audience for such an argument is the Pennsylvania legislature, not this court.

It is worth emphasizing what question the court presently is and is not answering.  It does not answer whether Harrisburg ultimately should be liable to Plaintiffs and, if so, to what degree.  That question is left for another court to answer.  Instead, the court answers whether Harrisburg's alleged behavior rises to the level of a *constitutional* violation.  Based on a neutral application of the law to the facts, the answer to that question is no.

## CONCLUSION

For the reasons explained, the court will grant Harrisburg's motion to dismiss.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 5, 2026